**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In the Matter of Dennis R. Powell, Debtor. | § | |
| | § | |
| TTT HOPE, INC., | § | |
| | § | |
| Plaintiff-Appellant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-3373 |
| | § | |
| JOSEPH M. HILL, | § | Appeal from Adversary Cause |
| | § | No. 06-3435 in Bankruptcy Cause No. |
| | § | 03-34773-H5-7, United States Bankruptcy |
| Defendant-Appellee. | § | Court for the Southern District of Texas |

**MEMORANDUM AND OPINION**

TTT Hope, Inc. appeals from the bankruptcy court's order granting summary judgment in favor of Joseph M. Hill, who served as the Chapter 7 trustee of Dennis Powell's bankruptcy estate. Powell had owned 90% of the shares of TTT Hope. The dispute arose from Hill's transfer of the proceeds from the sale of TTT Hope's primary asset to Dennis Powell's bankruptcy estate bank account. TTT Hope filed an adversary proceeding in the bankruptcy court asserting causes of action for turnover, conversion, monies had and received, negligence, and breach of fiduciary duty. Based on careful review of the record, the briefs, and the applicable law, this court affirms the bankruptcy court's order granting summary judgment dismissing these claims. The reasons are explained below.

1

I.      **Background**

In 1991, Powell formed TTT Hope as a subchapter S Texas corporation.  Powell owned 1,000 shares of common stock in TTT Hope, which was 90% of the equity in the company.  The Wilson Kasowski Investment Trust owned the remaining 10%.  Richard S. Ohendalski served as trustee of the Wilson Trust.

TTT Hope's primary asset was a lease of 15 acres of real property in Walker County, Texas.  TTT Hope acquired the lease by assignment in 1995.  The Texas Department of Criminal Justice was the lessor; Powell and his spouse, Lynda Powell, were the lessees.  The lease was for a 20-year initial term beginning in 1995 and could be renewed for two additional 20-year terms.  In 1998, a second 10-acre tract of land was added to the lease.

In 1998, TTT Hope entered into a sublease with Pilot Corporation on part of the 15-acre tract, where Pilot operated a truck-stop facility.  The sublease agreement provided Pilot with an option to purchase, on a fixed option date, TTT Hope's leasehold interest in that part of the 15-acre tract as well as TTT Hope's interest in the truck-stop facility.  TTT Hope also held several other subleases on the property.  TTT Hope was paid $41,800 per month in rent by its sublessees as of the date Powell filed for bankruptcy, March 31, 2003.  Pilot paid $37,400 of that monthly amount.

Powell and the Wilson Trust had entered into a stock buyout agreement in 2000 that provided TTT Hope's shareholders the right to acquire any shares affected by the occurrence of certain events, including bankruptcy.  In March 2003, relying on the entry of a large money judgment against Powell, the Wilson Trust exercised its option to purchase Powell's

2

1,000 TTT Hope shares.  Powell filed for Chapter 7 bankruptcy on March 31, 2003.  After Powell filed for bankruptcy, he transferred his TTT Hope shares to the Wilson Trust. Ohendalski was subsequently elected as sole officer and director of TTT Hope.

In February 2004, Hill, in his capacity as Dennis Powell's bankruptcy trustee, filed a complaint against the Wilson Trust for turnover of the 1,000 shares of TTT Hope stock as property of Powell's bankruptcy estate.  The action was dismissed when Ohendalski agreed to relinquish the shares.  Powell's 90% interest in TTT Hope became part of the bankruptcy estate.

In August 2004, Ohendalski, as president of TTT Hope, received notice of Pilot's desire to exercise the purchase option before the date provided in the sublease agreement. Hill, in his capacity as bankruptcy trustee, agreed to the sale.  Hill filed a motion in the bankruptcy court seeking approval to sell TTT Hope's leasehold interest to Pilot.  Hill had to withdraw the motion because of concern that the sale to Pilot would create undesirable tax consequences for the bankruptcy estate.  Hill was concerned because the Wilson Trust, the 10% shareholder of TTT Hope, was not a qualified trust for subchapter S purposes.

As part of his investigation into whether the sale to Pilot could proceed, Hill filed a complaint for turnover against Ohendalski, individually and as trustee of the Wilson Trust and against Financial & Tax Services, Inc.,  to obtain access to TTT Hope's corporate books and records.  On November 1, 2004, the bankruptcy court entered an agreed order that required a special shareholder meeting to elect new directors for TTT Hope and required Ohendalski to turn TTT Hope's financial and corporate records over to Hill when he was

3

elected director of TTT Hope at the special meeting.  (Docket Entry No. 5, Ex. G).  On November 11, 2004, Hill was elected president and sole director of TTT Hope in a special meeting in which Ohendalski telephonically participated on behalf of the Wilson Trust.

Hill engaged the bankruptcy estate's accountants to review TTT Hope's corporate records and to analyze the tax consequences of the Pilot sale.  Based on the analysis, Hill determined that the sale to Pilot was in the best interests of the bankruptcy estate and its creditors.  On December 28, 2004, Hill filed a second motion to sell property with the bankruptcy court, seeking approval of the Pilot sublease buyout.  The minority shareholder, the Wilson Trust, agreed.  In the motion, Hill disclosed that the 15-acre tract was encumbered by the following liens: 1) a promissory note to Compass Bank with an outstanding balance of $2,352,103.25 in principal and $4,756.64 in interest, secured by a deed of trust; 2) a promissory note to Compass Bank with an outstanding balance of $227,500 in principal and $594.03 in interest, secured by a deed of trust; and 3) a promissory note payable to the Gail W. Pate Trust with an estimated outstanding balance of $255,000, secured by a deed of trust. Hill also disclosed that as of August 31, 2004, TTT Hope's records showed the following accounts payable: 1) $10,000 to Legacy Group for tax services; 2) $29,771 to Financial and Tax Services; 3) $28,093 to Stephen Associates; and 4) $150,000 to the Wilson Trust for a venture capital loan.  (Docket Entry No. 5, Ex. F at 5-6).  Hill stated that although these notes and accounts payable were shown on TTT Hope's ledgers, there was no documentation to substantiate all the services rendered or monies loaned.

In the second motion to sell property,  Hill stated that the bankruptcy estate would net

(after taxes) approximately $900,00 on closing of the Pilot lease purchase and would owe taxes in the amount of $118,000.  (03-BK-34773, Docket Entry No. 106 at 6).  On January 24, 2005, the bankruptcy court entered an Agreed Order authorizing Hill, the trustee, to sell the lease to Pilot and to pay Compass Bank's note and deed of trust lien.  The order was agreed to by Hill and by counsel for the Gail Pate Trust, the Wilson Trust, and Compass Bank.  The Agreed Order stated that other than paying Compass Bank, the bankruptcy estate trustee "shall not disburse monies to the shareholders of TTT Hope pending substantiation and resolution, through litigation or settlement, in a court of competent jurisdiction, of any liens, including liens allegedly held by the Wilson Trust and the Pate Trust, and the accounts payable allegedly owed to the Legacy Group, Financial & Tax Services, and Stephen Associates."  (Docket Entry No. 5, Ex. G at 2).  The January 24, 2005 Agreed Order authorized the trustee to deposit the net sales proceeds into an account in the name of TTT Hope at Sterling Bank.  (*Id.*).  The Agreed Order also required Hill to comply with the requirements of the Texas Business Corporation Act and all other applicable law.  (*Id.*).  Hill completed the sale and deposited the net sales proceeds of $1,310,000 into an account at Sterling Bank in the name of TTT Hope.

As trustee of Powell's bankruptcy estate, Hill conducted further investigation during 2005 into the liens and accounts payable asserted against TTT Hope.  The investigation included a deposition of Ohendalski.  On June 22, 2005, Hill filed an adversary claim against Ohendalski and Financial & Tax Services for damages, including disgorgement of accountants' fees paid by TTT Hope.  Hill also filed an adversary claim against the Wilson

5

Trust seeking extinguishment of the $150,000 promissory note and the deed of trust lien. No answers were filed. The bankruptcy court entered a default judgment against the Wilson Trust and Ohendalski, declaring both the note and deed of trust lien extinguished and unenforceable. (Docket Entry No. 5, Ex. H at 6). The bankruptcy court also entered a default judgment against Financial & Tax Services for damages, including disgorgement of the fees paid. (*Id.*).

On January 20, 2006, Hill, as trustee, moved in the bankruptcy court for authority to sell the TTT Hope stock. In the motion, Hill identified TTT Hope's assets, including the sublease agreements that TTT Hope owned after the Pilot sale. Before the hearing on the motion to sell the stock, Hill moved on January 31, 2006 to vacate the January 24, 2005 Agreed Order. (Docket Entry No. 5, Ex. I). In the January 31, 2006 motion, Hill stated that as a result of the discovery he had conducted into the claims and liens against TTT Hope and into the accounts receivable, he had concluded that the amounts owed to Financial & Tax Services and to Ohendalski were invalid. These claims were resolved by the default judgments. Hill also stated that the Pate Trust promissory note and lien were unsubstantiated, that TTT Hope had received no consideration, and that the validity of the note and lien needed to be established. The Pate Trust had assigned this note and lien to St. Paul Surety. In the motion to vacate, Hill asked the bankruptcy court for authority to sell the TTT Hope stock at auction. In the motion, Hill assured the court that he "intends to pay all of TTT Hope's valid accounts payable and to escrow sufficient funds to pay St. Paul Surety pending resolution of its claim." (Docket Entry No. 5, Ex. I at 5-6). Hill stated that he would

6

begin an adversary proceeding against St. Paul Surety to obtain a determination as to the validity of the $300,000 note and lien. That adversary proceeding was filed and remains pending in the bankruptcy court.

In the motion to vacate the January 24, 2005 Agreed Order, Hill set out the pre-petition and post-petition accounts payable and notes that had already been paid or that he intended to pay. Amounts shown in TTT Hope records as owed to the Legacy Group, Compass Bank, and the Wilson Trust had been resolved. Amounts remained outstanding to Financial & Tax Services and Stephens Associates (for monies loaned) and St. Paul Surety (as assignee of the Gail Pate Trust, for the disputed note and lien). In the motion to vacate the Agreed Order, Hill stated that "[a]fter payment or escrow of monies to pay TTT Hope's accounts payable, Trustee will disburse all monies on deposit in TTT Hope's bank accounts to its shareholders pro rata – 90% to the Debtor's estate and 10% to the [Wilson] Trust." (Docket Entry No. 5, Ex. I at 5-6).

No objections were filed to the motion to vacate. The bankruptcy court granted the motion on February 2, 2006. (03-BK-34773, Docket Entry No. 145).

Hill closed TTT Hope's bank accounts and transferred the deposits to the bankruptcy estate's account at Sterling Bank on February 10, 2006. On the same date, Hill conducted an auction of the TTT Hope stock. Two bidders attended. One was Lynda Powell, the debtor's spouse. She was represented by the lawyer representing TTT Hope in this adversary proceeding and appeal. Powell was not the successful bidder.

On February 13, 2006, before the scheduled hearing on the trustee's motion to sell the

TTT Hope stock, Hill resigned as president of TTT Hope.  Lynda Powell tendered $150,000 in cash for the purchase.  The bankruptcy court approved Lynda Powell's purchase of the TTT Hope Stock.  Lynda Powell elected herself president and director of TTT.

On June 5, 2006, Lynda Powell attempted to withdraw money from the bankruptcy estate's bank account.  This money included the proceeds from the Pilot sale.  She was unable to do so because the money was not in a TTT Hope account.  Lynda Powell filed a state court suit in TTT Hope's name against Sterling Bank on June 5, 2006.  Sterling Bank removed.  TTT Hope's claims were litigated as an adversary proceeding in the bankruptcy court, which authorized Hill to intervene.  TTT Hope amended its complaint to add Hill as a defendant, both individually and as trustee of Dennis Powell's bankruptcy estate.

TTT Hope alleged breach of fiduciary duty and gross negligence based on Hill's transfer of the Pilot sale proceeds from TTT Hope's bank account to the bankruptcy estate's account.  TTT Hope did not challenge the sale itself.  TTT Hope claims that the transfer of the sale proceeds left the corporation insolvent, with no ability to pay the valid claims of creditors.  Hill responded that no breach occurred because the transfer was a proper distribution to TTT Hope shareholders and that the corporation remained solvent.  Hill also argued that there was no basis for a gross negligence claim as a matter of law, that he is entitled to trustee immunity, and that Lynda Powell lacks standing to sue.

Hill filed a motion for summary judgment in the adversary proceeding filed by TTT Hope.  The bankruptcy court granted the motion on October 2, 2007.  (06-BK-3435, Docket Entry No. 43).  This appeal followed.

8

## II.      The Standard of Review

In reviewing a bankruptcy court decision, a district court functions as an appellate court and applies the standards of review applied in the federal courts of appeal. *In re Webb*, 954 F.2d 1102, 1003-04 (5th Cir. 1992).  A grant of summary judgment is reviewed de novo, applying the same standard as the bankruptcy court. *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997).  Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471

9

(5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

## III.    Analysis

### A.    Standing

As a threshold matter, Hill argues that Lynda Powell lacks standing to bring this action on behalf of TTT Hope because she was not a shareholder when the fund transfer she challenges occurred. Hill argues that a "stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong." *Wingate v. Hadjik*, 795 S.W.2d 717, 719 (Tex. 1990). A shareholder may, however, enforce a corporation's cause of action against officers, directors, and third parties by way of a

10

derivative action.  *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.–Texarkana 1990, writ denied).  To bring a derivative action, an individual must have been "a shareholder . . . at the time of the act or omission complained of."  TEX. BUS. CORP. ACT ANN. art. 5.14(B) (Vernon 2003).  Hill argues that Lynda Powell does not have standing to bring a derivative action because she did not acquire her shares in TTT Hope until after Hill's allegedly wrongful acts.

This is not a derivative action.  Lynda Powell initiated this suit in her capacity as director, not as a shareholder suing on behalf of TTT Hope.  Directors exercise corporate powers, which includes the power to conduct litigation that seeks to redress harm to the corporation.  *See* TEX. BUS. CORP. ACT ANN. art. 2.31 (Vernon 2003).  As TTT Hope's director, Lynda Powell has standing to assert claims for harm to the corporation.

### B.   TTT Hope's Claims against Hill as Director

#### 1.   *Breach of Fiduciary Duty*

TTT Hope claims that Hill breached his fiduciary duty to the corporation by making a shareholder distribution that rendered it insolvent.  Hill moved for summary judgment in part on the basis that the distribution to the 90% shareholder, the Dennis Powell bankruptcy estate, was proper because it was authorized by the bankruptcy court, did not leave TTT Hope unable to pay its creditors, and left it solvent.

Corporate directors owe fiduciary duties to the corporation they serve.  *Gearhart Indus., Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 720 (5th Cir. 1984).  They must exercise

reasonable care, act in good faith and in the best interest of the corporation. *Fagan v. La Gloria Gas Co.*, 494 S.W.2d 624, 628 (Tex. App.–Houston [14th Dist.] 1973, no writ). The duty of care requires the director to be diligent and prudent in managing the corporation's affairs. *Gearhart*, 741 F.2d at 720.

Under certain circumstances, Texas imposes liability on directors for lack of due care by statute. TEX. BUS. CORP. ACT ANN. art. 2.41 (Vernon 2003). The board of directors may make distributions of money or property to shareholders unless such a distribution exceeds the surplus of the corporation or would render the corporation insolvent. *Id.*, art. 2.38. Directors who approve distributions that exceed the corporation's surplus or render the corporation insolvent are "jointly and severally liable to the corporation for the amount by which the distributed amount exceeds the amount permitted by Article 2.38." *Id.*, art. 2.41(A)(1). There is no liability if in approving the distribution, the director "relied in good faith and with ordinary care" on financial statements, data, reports, or opinions prepared by public accountants, legal counsel, or other individuals of similar professional competence. *Id.*, art. 2.41(C)(1).

"Insolvency" is defined by the Texas Business Corporation Act as "the inability of a corporation to pay its debts as they become due in the usual course of its business." *Id.*, art. 1.02A(16). The determination of whether a corporation is insolvent "may, but is not required to be based on: (1) financial statements of the corporation . . . ; (2) financial statements prepared on the basis of accounting used to file the corporation's federal income tax return . . . ; (3) financial information, including without limitation condensed or summary financial

statements, that is prepared on a basis consistent with the financial statements referred to in subsections (1) and (2) . . . ; (4) projection, forecast, or other forward looking information relating to future economic performance, financial condition, or liquidity of the corporation that is reasonable in the circumstances; (5) a fair valuation or information from any other method that is reasonable in the circumstances; (6) any combination of the statements, valuations, or information" listed above.  *Id.*, art. 2.38-3.[1]

Hill argues that as a director, he was legally entitled to transfer funds from TTT Hope to the bankruptcy estate as a dividend.  A corporation need not formally declare a dividend when it sets apart funds for distribution to its shareholders because that has the legal effect of a declared dividend.  *See Ramo, Inc. v. English*, 500 S.W.2d 461, 465 (Tex. 1973) (concluding that distribution of corporate funds to a controlling stockholder, regardless of the form of the transaction, is a dividend insofar as creditor's rights are concerned).  In distributing the proceeds of the Pilot sale, Hill was required to ensure that the distribution would not render TTT Hope insolvent or exceed the corporate surplus.

Hill presented competent summary judgment evidence that the distribution did not exceed TTT Hope's surplus.  TTT Hope's corporate income tax return for 2005 showed that the net long-term capital gain from the Pilot sale was $2,468,586, with taxable income of $2,488,852.  Because the distribution was roughly $1.3 million, the distribution did not

---

[1]Because the determination of solvency in this case relates to a corporate distribution, the TBCA definition of insolvency is applicable here, rather than other definitions.  *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 532-33 (5th Cir. 2004) (finding TBCA definition applicable in a suit involving insolvency and a proposed corporate distribution).

exceed the surplus.  TTT Hope did not dispute this evidence.  TTT Hope does dispute that it remained solvent after Hill made the distribution from the TTT Hope bank account to the bankruptcy estate's bank account on February 10, 2006.

TTT Hope's debts and liabilities are a key factor in determining its solvency.  In his January 31, 2006 motion to vacate the January 24, 2005 Agreed Order, Hill stated to the bankruptcy court that he "has paid or will pay TTT Hope's pre-petition and post-petition accounts and notes payable as follows: (a) Legacy Group, $10,000- paid; (b) Financial & Tax Services, $20,000- will be paid; (c) Stephen Associates, $20,000- will be paid; (d) Compass Bank, $2,583,511- paid; (e) St. Paul Surety (assignee of Gail Pate Trust), $300,000- claim will attach to the proceeds distributed to the bankruptcy estate pending resolution of claim by bankruptcy court; (f) Wilson Kasowski Investment Trust, $150,000- voided by default judgment; (g) Internal Revenue Service, $120,000 (post-petition tax liability)- will be paid; (h) Smith & Henault, $16,000- will be paid."  (Docket Entry No. 5, Ex. I at 6).  Hill stated that "[a]fter payment or escrow of monies to pay TTT Hope's accounts payable, Trustee will disburse all monies on deposit in TTT Hope's bank accounts to its shareholders pro rata – 90% to the Debtor's estate and 10% to the [Wilson] Trust."  (*Id.*).  In moving for summary judgment, Hill stated that the identified liens and accounts payable represented all of TTT Hope's known liabilities at the date Hill transferred the Pilot sale proceeds to the bankruptcy estate.

To support his claim that there is no dispute as to whether TTT Hope was solvent after the transfer, Hill submitted the report of James P. Smith, C.P.A., who reviewed TTT Hope's

14

books and records and prepared its 2005 tax return.  (Docket Entry No. 5, Ex. C).  Consistent with the TBCA, this report uses financial statements prepared for the purpose of filing a tax return to determine solvency.  In his report, Smith concluded that TTT Hope was solvent as of December 31, 2005 and through February 10, 2006, when Hill made the distribution to the bankruptcy estate.  Smith recognized that TTT Hope's 2005 tax return reflected corporate liabilities of $881,852.00, but stated that these liabilities were "apparently overstated as of that date."  Smith determined that shortly before February 10, 2006, TTT Hope's assets were approximately $1,369,000.00 and  its "known liabilities . . . totaled $370,000.00 for which funds were reserved by the Trustee."  (*Id.*).  The liabilities Smith used in calculating the $370,000 figure are claims by the Legacy Group for $10,000, Financial & Tax Services for $30,000, Stephen Associates for $30,000, and the disputed claim by the Gail Pate Trust for $300,000.  (*Id.* at 2).  Because these were, according to Hill, all TTT Hope's known liabilities as of February 10, 2006, and funds had been reserved in the bankruptcy estate to pay these amounts, the corporation was not left insolvent by the transfer of the funds to the bankruptcy estate's bank account.

TTT Hope submitted a report by Elizabeth H. Nelson, C.P.A., who reviewed the financial documents, including the 2005 tax return, and banking records to calculate the solvency of TTT Hope.  (06-BK-3435, Docket Entry No. 41, TTT Hope's Response to Trustee's Motion for Summary Judgment, Ex. 10).  Based on these documents, Nelson determined that as of December 31, 2005, TTT Hope's total assets were $1,379,615, with total liabilities of $881,849.  (*Id.*).  Using TTT Hope's banking records, Nelson calculated

that as of February 9, 2006, the total assets were $46,507, with total liabilities of $774,849. (*Id.*).  Using the TBCA test of insolvency, Nelson concluded that TTT Hope became insolvent after Hill transferred $1.3 million from TTT Hope's account to the bankruptcy estate.

TTT Hope's evidence does not identify any specific debts or accounts payable that remain unpaid or for which a procedure to resolve validity has not been set up.  Assuming the $774,849 in liabilities Nelson calculated includes the $370,000 Hill reserved in the bankruptcy estate's bank account to pay the claims of TTT Hope's creditors once their validity was resolved, TTT Hope asserts that over $400,000 in other liabilities remain. Nelson relies solely on the 2005 tax return.  The record shows that in conjunction with the Pilot sale, Hill investigated TTT Hope's liabilities and engaged accountants to review corporate records.  As a result of this investigation, Hill determined the total amount of TTT Hope's valid outstanding debts and accounts payable as of the date he distributed funds from TTT Hope to the bankruptcy estate.  The investigation showed that there had been significant problems with the accounting and financial work done by TTT Hope's former accountants. In preparing the 2005 tax return, Smith carried forward TTT Hope's liabilities as recorded by the former accountants and made adjustments for the known transactions.  Hill filed an adversary proceeding against Financial & Tax Services and Ohendalski based on the validity of certain of their claims and obtained default judgments.  TTT Hope has not identified or submitted evidence as to any specific liabilities other than those Hill identified and either paid or set up a procedure to challenge and pay if shown valid.  There is no genuine factual

16

dispute as to TTT Hope's liabilities after Hill made the distribution to the bankruptcy estate.

TTT Hope's assets are also part of determining its solvency after the transfer. After the Pilot

sale, TTT Hope retained other subleases from which it continued to derive rental income, in

the amount of $4,400 per month. The sale of TTT Hope stock is also an asset of the

corporation that can be used to pay liabilities, such as the disputed Pate Trust lien if it is

determined to be valid. There is no evidence of specific unpaid TTT Hope liabilities beyond

the sums escrowed in the transferred amount and TTT Hope's other assets. Because there

is no genuine factual issue material to determining whether TTT Hope was solvent when the

transfer occurred, Hill is entitled to judgment as a matter of law on TTT Hope's breach of

fiduciary duty claim.

Even if a fact issue on the corporation's solvency remained, Hill would be entitled to

summary judgment because in making the transfer, he relied in good faith on financial

reports prepared by public accountants and other persons with similar professional

competence. TEX. BUS CORP. ACT ANN. art 2.41(C) (Vernon 2003).[2] The record does not

give rise to a disputed fact issue as to whether, when Hill transferred the funds, he had a

reasonable basis to believe that the transfer would make the corporation insolvent. Hill had,

through litigation and discovery, learned extensive information about the accounting and tax

---

[2]Although Hill did not specifically plead the affirmative defense of good-faith reliance on financial reports, his failure to do so does not preclude application of the defense. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 499-500 (5th Cir. 1990). In the absence of unfair surprise, a defendant does not waive an affirmative defense by failing to plead it. *Id.* TTT Hope would not be unfairly surprised because Hill's liability for making an allegedly improper corporate distribution, his reliance on accountant's reports, and his investigation to determine TTT Hope's liabilities were all at issue throughout the adversary proceeding in the bankruptcy court.

records of TTT Hope.  Hill had identified the liens and accounts payable; determined which ones were disputed and which ones should be paid; obtained court orders resolving many of them; put into place a procedure to determine the validity of one remaining claim and pay it if it was determined to be valid; and ensured that funds were available to pay the outstanding valid liens and accounts payable.  There is no disputed fact issue material to determining that, as a matter of law, Hill made the transfer in good-faith reliance on financial records indicating that TTT Hope would not be rendered insolvent by the transfer.

### 2.    *The Gross Negligence Claim*

TTT Hope alleged that Hill was grossly negligent in performing his duties as director of the corporation.  Hill moved for summary judgment in part on the basis that distributing the funds to the bankruptcy estate, the 90% shareholder of TTT Hope, was not grossly negligent.

The fiduciary duties of corporate officers and directors "are creatures of state common law." *Gearhart Industries v. Smith Intern., Inc.*, 741 F.2d 707, 719 (5th Cir. 1984) (citing *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549 (1949)).  In *Cates v. Sparkman*, the court stated that negligent acts by directors in the exercise of their duties, "however unwise or inexpedient such acts might be" do not warrant "interference by the courts." 11 S.W. 846, 849 (Tex. 1889).  The business-judgment rule bars simple negligence claims for breach of a director's duty of care.  *Id.*; *see also Roth v. Mims*, 298 B.R. 272, 282 (N.D. Tex. 2003).  The Texas Supreme Court has not directly addressed the issue of director liability for gross negligence.

18

Several federal district courts in Texas have held that the business-judgment rule does not bar claims for gross negligence under Texas law.  *See F.D.I.C. v. Benson*, 867 F.Supp 512, 523 (S.D. Tex. 1994) (concluding that Texas business-judgment rule will protect a director as long as his acts are not grossly negligent or a complete abdication of duty); *F.D.I.C. v. Schreiner*, 892 F.Supp 869, 880-82 (W.D. Tex. 1995) (noting the consensus among federal district courts in Texas that "under the . . . business-judgment rule corporate officers and directors are liable, at a minimum, for grossly negligent acts").  Although *Cates* does not include the term "gross negligence" the court's statement that "injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive to the rights of the minority, or a shareholder" are not protected by the rule, 11 S.W. at 849, "can be fairly interpreted as exempting from the protection of the business-judgment rule grossly negligent conduct of a director."  *F.D.I.C. v. Brown*, 812 F.Supp 722, 725 (S.D. Tex. 1992).  In *Floyd v. Hefner*, No. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006), the court distinguished these cases as limited to bank officers and directors, who are held to a higher standard of care than the directors of other corporations.  *See  Seale v. Baker*, 7 S.W. 742, 747 (Tex. 1888).  The *Floyd* court determined that the business-judgment rule would apply to protect the defendant directors of an oil exploration and production company, which is a "far more speculative business" than a bank, from gross negligence claims.  2006 WL 2844245 at *28.

Although the cases are divided as to whether the business-judgment rule allows a gross negligence claim against a director or officer under Texas law, this issue need not be

19

resolved to decide the present appeal.  Even assuming that the purpose of the business-judgment rule, to protect directors from liability for decisions "within the exercise of their discretion and judgment in the development or prosecution of the enterprise," *Gearhart*, 741 F.2d at 721, is consistent with recognizing a gross negligence claim, the present record does not raise a fact issue that would preclude summary judgment dismissing the claim.

Texas law defines gross negligence as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1980) (citing *Missouri Pacific Ry. v. Shuford*, 10 S.W. 408, 411 (1888)).  A gross-negligence claim presumes a negligent act or omission and requires two further elements: 1) an act or omission that objectively involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.  TEX. CIV. PRAC. REM. CODE ANN. § 41.001 (Vernon 2008).  Gross negligence "contains both an objective and a subjective component."  *Wal-Mart v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993). Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct.  *Id.*  Objectively, the defendant's conduct must involve an extreme degree of risk, a threshold significantly higher than the objective "reasonable person" standard for negligence.  *Id.*  Either element of gross negligence can be proven by circumstantial evidence.  *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).

The record does not raise a fact issue as to Hill's gross negligence.  To the contrary, the record shows that Hill took extensive steps to ensure that the legitimate claims of TTT Hope were paid after the transfer of the Pilot sale proceeds.  The record shows that Hill faced a difficult situation involving litigious parties and records that were first unavailable and then unclear.  Hill navigated this difficult situation by, among other things, filing the appropriate motions for bankruptcy-court approval before taking such steps as becoming the director of TTT Hope, obtaining its records, evaluating the proposed sale of the Pilot lease, selling the Pilot lease, evaluating the liens and accounts receivable for TTT Hope, determining those that should be challenged and obtaining judgments disposing of many of them, putting a procedure into place for resolving the remaining disputed claims, and obtaining court approval for the transfer of the net proceeds from the Pilot sale with a large amount reserved to cover the remaining identified unpaid liabilities.  Hill has retained the transferred funds in the bankruptcy estate's account pending orders of the bankruptcy court.  The bankruptcy court orders were filed on motions that were either agreed to or not objected to.  The record does not permit a ruling that Hill was grossly negligent in transferring the funds, under the terms and conditions he sought and followed.

It is instructive to compare the present record to the facts in *F.D.I.C. v. Schreiner,* 892 F.Supp 869, 873-74 (W.D. Tex. 1995).  In this case, directors of a federally-insured bank approved dividends to the bank's holding company and loans to insiders at a time when the bank was in financial trouble and had been warned by the FDIC about its credit underwriting practices.  The FDIC submitted bank documents showing that various loans were made to

21

individuals "on terms and conditions not available to other borrowers in violation of Regulation O." *Id.* at 876. Evidence indicated that the bank's last operating profit was in 1986, and yet the board of directors approved the sale of securities that allowed the bank to pay a large dividend to its holding company in 1987. *Id.* There was also evidence that these transactions constituted a risk of harm to the bank's solvency and FDIC rating, and that the directors were aware of the risks through various examiner and auditor reports. *Id.* at 884. The court found that the FDIC's evidence raised a fact issue whether the directors were grossly negligent in making the loans and approving the dividends. *Id.*; *see also Weaver v. Kellogg*, 216 B.R. 563, 584 (S.D. Tex. 1997) (finding genuine fact issue regarding gross negligence where defendant directors renegotiated promissory notes to preclude company from accelerating notes in default when company was unable to pay its accounts); *but see Benson*, 867 F.Supp at 522 (finding no fact issue on gross negligence of bank directors because no evidence indicated that defendants knew loans violated regulations).

The bankruptcy court's grant of summary judgment dismissing the gross negligence claim is affirmed.

### B.     TTT Hope's Claims against Hill as Trustee

TTT Hope also alleges that Hill's actions as a trustee were grossly negligent. TTT Hope alleges that Hill acted without court approval and was under a conflict of interest by simultaneously serving as trustee of Powell's bankruptcy estate and as director of TTT Hope. Hill maintains that his conduct as trustee does not rise to the level of gross negligence because it was not "an intentional failure to perform a manifest duty in reckless disregard of

the consequences." *In re Smyth*, 207 F.3d 758, 762 (5th Cir. 2000).

A Chapter 7 trustee must "collect and reduce to money the property of the estate for which such trustee serves." 11 U.S.C. § 704(a)(1); *see also In re Cowan*, 235 B.R. 922, 924 (Bankr. W.D. Mo. 1999) ( trustee's duty is to collect and conserve the estate's property). A central purpose of the Bankruptcy Code is to place the estate's property under court control for equal distribution to the creditors. *In re OC Piping Installations, Inc.*, 225 B.R. 553, 564 (Bankr. E.D.N.Y. 1998). The trustee's duty is to maximize the estate to allow maximum recovery for the debtor's creditors. *Id.*; *see also* 6 COLLIER ON BANKRUPTCY 704.02(3) (15th ed. 2000) ("[I]t is the trustee's duty . . . to realize from the estate all that is possible for distribution among the creditors.").

A bankruptcy trustee is a fiduciary and "like any other fiduciary...must act with reasonable care and due diligence in discharging . . . statutory duties." *In re Melenyzer*, 140 B.R. 143, 154 (Bankr. W.D. Tex. 1992). A bankruptcy trustee does not, however, owe fiduciary duties to parties other than the debtor and creditors of the bankruptcy estate. *In re 2001 Cincinnati, Inc. VIP Clubs of America*, 43 B.R. 6, 7, (Bankr. S.D. Ohio 1984). Trustees are not subject to personal liability unless their conduct amounts to gross negligence. *Smyth*, 207 F.3d at 762.

As the Chapter 7 debtor's trustee, Hill did not owe duties to TTT Hope. The corporation is not a creditor of Dennis Powell's bankruptcy estate. When Hill transferred funds from TTT Hope's account to the bankruptcy estate, he was fulfilling his trustee duty to maximize the bankruptcy estate. For actions taken in his capacity as trustee, Hill did not

23

owe TTT Hope a legal duty.  The bankruptcy court properly granted summary judgment on TTT Hope's claims against Hill in his capacity as trustee.

###### C.      Does Trustee Immunity Shield Hill from Liability for Acts Taken as a Director of TTT Hope?

Bankruptcy trustees are generally entitled to immunity from personal liability.  *In re Thurman*, 163 B.R. 95, 100 n.6 (Bankr. W.D. Tex. 1994) (citing *Yadkin Valley Bank & Trust Co. v. McGee*, 819 F.2d 74 (4th Cir. 1987)).   Trustees are entitled to absolute judicial immunity when acting under court order, *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981), and to qualified immunity for other actions taken in their official capacity as officers of the court.  *In re Solar Financial Services, Inc.*, 255 B.R. 801, 803 (Bankr. S.D. Fla. 2000).  Trustees can be held personally liable for acts taken outside the scope of their authority.  *United States v. Sapp*, 641 F.2d 182, 184 (4th Cir. 1981).

Hill asserts that he is entitled to absolute immunity because the challenged action of transferring funds from TTT Hope's account to the bankruptcy estate was taken in his capacity as a trustee after obtaining authority from the bankruptcy court.  The January 24, 2005 Agreed Order stated that Hill would "not disburse monies to the shareholders of TTT Hope pending substantiation and resolution . . . of any liens . . . and the accounts payable allegedly owed."  (Docket Entry No. 5, Ex. G at 2).  In his Expedited Motion to Vacate the Agreed Order, Hill represented to the bankruptcy court that "[a]fter payment or escrow of monies to pay TTT Hope's accounts payable, Trustee will disburse all monies on deposit in TTT Hope's Bank accounts to its shareholders pro rata." (Docket Entry No. 5, Ex. I at 6).

In asserting judicial immunity, Hill argues that although he transferred the funds to the bankruptcy estate's bank account, no distribution to the shareholders has been made and that the funds are in escrow in the bankruptcy estate's account.  (Docket Entry No. 7, at 13).  At a hearing held on the appeal, the parties agreed that the money transferred to the bankruptcy estate account was being held in that account and would only be released by bankruptcy court order.  The bankruptcy court granted Hill's motion to vacate the earlier Agreed Order requiring Hill to keep the funds in an account in the name of TTT Hope.  In the motion to vacate, Hill stated that he would transfer the funds to the bankruptcy estate's account and that he would not disburse the funds until after payment or escrow of monies to pay TTT Hope's valid accounts payable and liens. (Docket Entry No. 5, Ex. I).  Hill was acting pursuant to and consistent with the bankruptcy court's order when he transferred, then held, the funds in the bankruptcy estate's account.  It is also undisputed Hill transferred the funds as part of his duty as trustee to maximize the bankruptcy estate.  As such, he was acting in his official capacity and is at a minimum entitled to qualified immunity.  In an action by a party who is neither the debtor nor a creditor of the estate, the trustee is immune if he had reasonable grounds to act and did so in good faith.  *See Leonard v. Vrooman*, 383 F.2d 556, 560 (9th Cir. 1967).  For his actions taken as trustee, Hill is entitled to judgment as a matter of law on immunity.

Trustee immunity does not protect Hill against TTT Hope's fiduciary duty and gross negligence claims for actions taken in his capacity as a director.  Trustees are only entitled to immunity for actions taken in their official capacity as officers of the court. *In re Solar*

*Financial Services, Inc.*, 255 B.R. at 803.   Unlike trustees, corporate directors are not immune from liability merely by virtue of their position.   Director liability for negligence and breach of the duty of care is assessed under the business-judgment rule, and not under principles of immunity.   Accordingly, Hill's trustee immunity does not shield him from liability for acts taken in his capacity as director.   However, this conclusion does not preclude summary judgment, because Hill is entitled to judgment as a matter of law as to TTT Hope's claims against him as a director.

## IV.    Conclusion

The bankruptcy court's grant of summary judgment to Hill is affirmed.   This appeal is dismissed by separate order.

SIGNED on September 2, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge